Filed 6/19/15 (unmodified opinion attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STEPHEN K. DAVIS, | F068477 |
| Plaintiff and Appellant, | (Super. Ct. No. 12CECG03718) |
| v. | **ORDER MODIFYING OPINION**<br>**[No Change in Judgment]** |
| FRESNO UNIFIED SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the published opinion filed herein on June 1, 2015, be modified as follows:

1.     On page 3, the second sentence of the first paragraph under the facts heading, change "In September 2012" to "On September 26, 2012."

2.     At the end of the last paragraph on page 4, the last two sentences beginning "However, consistent" and ending with "in fact, terminated," are deleted and the following sentences are inserted in their place.

> However, consistent with Davis's allegations of fact, Fresno Unified's opening brief acknowledged the Facilities Lease was in effect only during the construction of the school facilities and its counsel confirmed during oral argument that a phased completion of the project was not used in this case.  Thus, the brief and counsel's statement do not contradict the allegation that Fresno Unified did not occupy or use the newly constructed facilities during the term of the Facilities Lease.

3.     On page 5, the first paragraph under the proceedings heading, "In November 2012" is changed to "On November 20, 2012."

4.    On page 5, the first sentence of footnote 4 beginning with "Defendants could have" is deleted and the following sentence is inserted in its place.

>Defendants could have avoided the uncertainty and risk associated with completing the project while this taxpayer challenge was pending by bringing a validation action under Code of Civil Procedure section 860 prior to starting construction.

5.    On page 5, footnote 4, the following paragraph is added to the end of footnote 4.

>Davis's taxpayer suit is a timely "reverse validation" action because it was filed within 60 days of the adoption of the resolutions authorizing the execution of the Lease-Leaseback Contracts.  (See Code Civ. Proc., §§ 860, 863.)  Besides being a taxpayer, Davis is the president of Davis Moreno Construction, Inc., a general contractor that has handled construction projects for school districts.  (See *Department of Industrial Relations v. Davis Moreno Construction, Inc.* (2011) 193 Cal.App.4th 560, 573; *Davis Moreno Construction, Inc. v. Frontier Steel Bldgs. Corp.* (E.D.Cal. Nov. 9, 2009, No. CV-F-08-854 OWW) 2009 U.S.Dist. Lexis 104167.)

6.    On page 10, the second full paragraph, at the end of the second full sentence the word "lease" is changed to "leaseback."  So the end of the sentence now reads: "namely, the term of the leaseback."

7.    The last two sentences of the second paragraph on page 10 and continuing to page 11, beginning "However, the parties to a" and ending "lease-leaseback arrangement" are deleted and the following sentences and footnote are inserted in their place.  This shall be footnote number 9, which will require renumbering of all subsequent footnotes.

>However, the parties to a lease-leaseback arrangement can achieve the same result without structuring the transaction as a lease-leaseback.  For instance, the same extended stream of payments to the builder can be set forth in a payment schedule to a traditional construction agreement.  Also, such an agreement can provide the school district with the same use and ownership of the new facilities that it received under a lease-leaseback arrangement. [9]
>
>_____
>
>[9]    Here, Davis alleged that the terms governing the construction and payments could have been set forth in a "traditional purchase

2

type construction contract" and, as a result, the formalities of a site lease and leaseback added nothing *of substance* to the transaction because they did not provide financing for the project.

8. On page 11, the first sentence of the first full paragraph, beginning "Consequently, we" is deleted and the following sentence is inserted in its place.

> The fact that the same results could have been achieved under an alternate, simpler contractual arrangement leads us to consider why the Legislature chose a complicated lease-leaseback structure for builder-financed construction.

9. At the end of the third paragraph on page 17, after the sentence ending "or any other published decision," add as footnote 11 the following footnote, which will require renumbering of all subsequent footnotes.

> [11] The current use of section 17406 as a lease-leaseback delivery method has not been without controversy, which may explain why the Construction Provisions contain an indemnity provision whereby Fresno Unified agreed to "indemnify, hold harmless and defend Contractor…from any action…to challenge the propriety or legal authority of [Fresno Unified under section 17406] to enter into the Construction Provisions, the Site Lease or the Facilities Lease." Fresno Unified also agreed to pay all Contractor's costs in defending any such action, including any legal fees and judgments.

10. On page 23, the following sentence is added to the end of the second full paragraph.

> They also support Davis's allegations that the true nature of the Lease-Leaseback Contracts was that of a "traditional purchase type construction contract" and the purpose for using the lease-leaseback arrangement was to avoid the competitive bidding process by subterfuge or sham.

11. At the end of the second full paragraph on page 33, after the sentence ending in "project is being constructed," add as footnote 18 the following footnote, which will require renumbering of all subsequent footnotes.

> [18] For purposes of demurrer, we accept the allegations about the existence and contents of the prior contract as true, even though counsel for Fresno Unified stated during oral argument that there was no preconstruction contract.

3

12.    On page 33, third full paragraph, in the first sentence the word "referred" is changed to "refers" and in the second sentence the word "cited" is changed to "cites."

13.    On page 41, first sentence of the second full paragraph, the word "fact" is changed to "facts."

There is no change in judgment.

_____

Franson, J.

WE CONCUR:

_____

Levy, Acting P.J.

_____

Gomes, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STEPHEN K. DAVIS, | F068477 |
| Plaintiff and Appellant, | (Super. Ct. No. 12CECG03718) |
| v. | **OPINION** |
| FRESNO UNIFIED SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | |

APPEAL from judgment of the Superior Court of Fresno County. Donald S. Black, Judge.

Carlin Law Group and Kevin R. Carlin for Plaintiff and Appellant.

Briggs Law Corporation, Cory J. Briggs, Mekaela M. Gladden and Anthony N. Kim for Kern County Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Atkinson, Andelson, Loya, Ruud & Romo, Martin A. Hom and Jennifer D. Cantrell for Defendant and Respondent Fresno Unified School District.

Fagen Friedman & Fulfrost, Kathy McKee, Paul G. Thompson, James Traber and Luke Boughen for California's Coalition for Adequate School Housing as Amicus Curiae on behalf of Defendant and Respondent Fresno Unified School District.

Lozoya & Lozoya and Frank J. Lozoya for Defendant and Respondent Harris Construction Company, Inc.

-ooOoo-

Plaintiff Stephen Davis is a taxpayer challenging a noncompetitive bid contract between the Fresno Unified School District (Fresno Unified) and Harris Construction Co., Inc. (Contractor) for the construction of a middle school for $36.7 million. The construction was completed in 2014 pursuant to a lease-leaseback arrangement that Fresno Unified and Contractor contend is exempt from competitive bidding under Education Code section 17406.[1]

Davis alleged the school construction project should have been competitively bid because the lease-leaseback arrangement did not create a true leaseback or satisfy the criteria for the exception in section 17406. Davis also alleged Fresno Unified's board breached its fiduciary duties by approving the costly arrangement and Contractor had an impermissible conflict of interest that rendered the lease-leaseback agreement void.

The trial court sustained demurrers filed by Fresno Unified and Contractor. Davis appealed.

As to the causes of action based on the Education Code, we conclude (1) the competitive bidding process required by section 17417 is subject to the exception contained in section 17406 and (2) Davis adequately alleged three grounds for why section 17406's exception did not apply to the lease-leaseback arrangement. First, Davis alleged the exception is available only for genuine leases and the subject leaseback agreement was simply a traditional construction agreement and not a genuine lease. Second, Davis alleged the agreement did not include a financing component for the construction of the project. Third, Davis alleged the lease-leaseback arrangement did not

---

[1] All further statutory references are to the Education Code unless otherwise stated.

provide for Fresno Unified's use of the newly built facilities "during the term of the lease," as required by section 17406.

As to the conflict of interest cause of action, we conclude Government Code section 1090's prohibition of such conflicts extends to corporate consultants. Davis has stated a violation of Government Code section 1090 by alleging facts showing Contractor, as a consultant to Fresno Unified, participated in the making of a contract in which Contractor subsequently became financially interested.

We therefore reverse the judgment.

**FACTS**

This case involves a project for the construction of buildings and facilities at the Rutherford B. Gaston Sr. Middle School, located in southwest Fresno. In September 2012, Fresno Unified's governing board adopted a resolution authorizing the execution of contracts pursuant to which Fresno Unified would lease the project site to the Contractor, which would build the project on the site, and lease the improvements and site back to Fresno Unified. The contracts were a Site Lease and a Facilities Lease (collectively, the Lease-Leaseback Contracts).

Under the Site Lease, Fresno Unified leased the project site to Contractor for $1 in rent. The Site Lease began on September 27, 2012, and terminated the same day as the Facilities Lease. The Site Lease is the "lease" in the lease-leaseback arrangement.

The Facilities Lease was structured so that Contractor would (1) build the project on the site pursuant to the "Construction Provisions" attached as an exhibit to the Facilities Lease and (2) sublease the site and project to Fresno Unified[2] in exchange for payments under a "Schedule of Lease Payments." The Construction Provisions were a detailed construction agreement (55 pages long) whereby Contractor agreed to build the

---

[2]     This sublease by Contractor of the site and facilities to Fresno Unified constitutes the "leaseback" part of the lease-leaseback arrangement.

3

project in accordance with the plans and specifications approved by Fresno Unified for a guaranteed maximum price of $36,702,876. Completion was to be 595 days from the notice to proceed.

The "Schedule of Lease Payments" attached to the Facilities Lease simply referred to the "payments for the Project as set forth in the Construction Provisions." The Construction Provisions outlined monthly progress payments for construction services rendered each month, up to 95 percent of the total value for the work performed, with a 5 percent retention pending acceptance of the project and recordation of a notice of completion. Final payment for all of the work was to be made within 35 days after recordation by Fresno Unified of the notice of completion. Simply put, the funds paid by Fresno Unified under the Facilities Lease were based solely on the construction services performed by Contractor.[3]

Once the project was completed and the final lease payment made, the Facilities Lease terminated. Counsel for Fresno Unified confirmed at oral argument that the term of the lease was from the date of signing to the date of completion. As to possession of the project, the Facilities Lease stated that Fresno Unified was allowed to take possession of the project "as it is completed." However, consistent with Davis's allegations of fact, Fresno Unified's opening brief acknowledged the Facilities Lease was in effect only during the construction of the school facilities. This fact was confirmed during oral argument when counsel for Fresno Unified stated that Fresno Unified did not occupy the school facility until the lease was, in fact, terminated.

---

[3]     Thus, the progress payments made by Fresno Unified under the Facilities Lease were not "rent" in the usual sense of the word—that is, consideration paid periodically in exchange for the use or occupancy of real property. (Black's Law Dictionary (9th ed. 2009) p. 1410 [definition of rent].)

4

As to ownership of the newly constructed improvements, the Facilities Lease provided that Fresno Unified would obtain title from Contractor "as construction progresses and corresponding Lease Payments are made to [Contractor]." In addition, the Facilities Lease provided that once Fresno Unified paid all of the lease payments, all rights, title and interest of Contractor in the project and the site would vest in Fresno Unified.

## PROCEEDINGS

In November 2012, Davis filed his original complaint.[4] The operative pleading is the first amended complaint (FAC) he filed in March 2013. The causes of action in the FAC are (1) violation of the competitive bidding requirements of the Public Contract Code by entering into an improper lease-leaseback arrangement that did not satisfy the criteria for the statutory exception outlined in subdivision (a)(1) of section 17406 (section 17406(a)(1)); (2) breach of fiduciary duty by the Board of Fresno Unified; (3) failure to comply with the competitive bidding requirements of section 17417; (4) conflict of interest by Contractor based on its participation in the planning and design of the project as a consultant to Fresno Unified before the contracts for the project's construction were awarded; (5) improper use of section 17400 et seq., based on the legal theory that lease-leaseback arrangements are allowed only when used for financing school construction; (6) improper delegation of discretion; and (7) declaratory relief.

---

[4] Defendants could have avoided this post-completion taxpayer challenge by bringing a validation action under Code of Civil Procedure section 860 prior to construction of the project. "A validation action … allows a public agency to obtain a judgment that its financing commitments are valid, legal, and binding. If the public agency has complied with statutory requirements, the judgment in the validation action binds the agency and all other persons." (*Friedland v. City of Long Beach* (1998) 62 Cal. App.4th 835, 838.) The record in this case shows that the use of validation actions is a common practice for school construction projects structured as a lease-leaseback arrangement. (See fn. 5, *post*.)

5

Davis alleged that, although the site was leased by Fresno Unified to Contractor while Contractor performed the construction, there was no genuine leaseback to Fresno Unified because Fresno Unified did not regain the right to use and occupy the property during the leaseback period. Davis also alleged that Fresno Unified made payments that lasted only as long as the duration of construction, varied based upon the value of the work performed, and ended with the completion of the construction. In addition, Davis alleged that Fresno Unified did "not have the right or practical ability to have beneficial occupancy of the demised premises during the term of the Facilities Lease to use them for their intended purposes."

In April 2013, Fresno Unified filed a demurrer to the FAC, which was supported by a request for judicial notice.[5] In May 2013, Contractor filed a separate demurrer that was similar to Fresno Unified's.

Davis opposed the demurrers and objected to the request for judicial notice. Davis also lodged 11 exhibits with the trial court to support his opposition to the demurrers.

In August 2013, the trial court sustained both demurrers to each of the seven causes of action in the FAC. The court granted Davis 30 days leave to amend. Counsel for Davis informed counsel for Fresno Unified that Davis did not intend to file a second amended complaint. After the 30-day period expired, defendants filed applications for dismissal of the action and entry of judgment.

In September 2013, judgment was entered in favor of Fresno Unified and Contractor. Davis appealed.

---

[5] Fresno Unified's request for judicial notice included copies of 22 default judgments entered from December 2010 to July 2012 in validation actions brought by school districts in Los Angeles, Orange, Riverside, San Bernardino, Ventura and Kern Counties. The default judgments stated that site leases, subleases, and construction services agreements entered into by the school districts pursuant to section 17406 were not subject to the requirement in Public Contract Code section 20111 that construction contracts be awarded to the lowest responsible bidder.

6

# DISCUSSION

## I.    STANDARD OF REVIEW

### A.    Demurrers

Appellate courts independently review the ruling on a general demurrer and make a de novo determination of whether the pleading alleges facts sufficient to state a cause of action.  (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.)

Generally, appellate courts "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  [Citation.]"  (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865 (*Dinuba*).)  Also, the demurrer is treated as admitting all material facts properly pleaded, but does not admit the truth of contentions, deductions or conclusions of law.  (*Ibid.*)

Ordinarily, the allegations in a pleading "must be liberally construed, with a view to substantial justice between the parties."  (Code Civ. Proc., § 452.)  However, this principle of liberal construction does not apply when, as in this case, a plaintiff has been granted leave to amend and elects not to do so.  (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1091, abrogated on another ground in *Martinez v. Combs* (2010) 49 Cal.4th 35, 62-66.)  In such cases, appellate courts will construe the pleading strictly, based on the rationale that the plaintiff's election indicates he or she believes the pleading has stated the strongest case possible.  (*Reynolds, supra,* at p. 1091.)

### B.    Statutory Construction

This appeal presents a number of issues relating to the proper construction of the Education Code provisions addressing lease-leaseback arrangements and the Government Code provisions addressing conflicts of interest.

Issues of statutory construction are questions of law subject to independent review by appellate courts.  (*Neilson v. City of California City* (2007) 146 Cal.App.4th 633, 642.)

7

"A reviewing court's fundamental task in construing a statute is to determine the intent of the lawmakers so as to effectuate the purpose of the statute. [Citations.] Courts start this task by scrutinizing the actual words of the statute, giving them their usual, ordinary meaning. [Citation.] When statutory language is clear and unambiguous (i.e., susceptible to only one reasonable construction), courts adopt the literal meaning of that language, unless that literal construction would frustrate the purpose of the statute or produce absurd consequences. [Citation.]

"Alternatively, when the statutory language is ambiguous, courts must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute. [Citation.] The interpretation of ambiguous wording is guided by the fundamental principle that courts construe those words in the context and with reference to the entire scheme of law of which they are a part. [Citations.] Courts resolving statutory ambiguity also may be aided by the ostensible objects to be achieved by the legislation, the evils to be remedied, the legislative history, and public policy. [Citation.] When a court interprets an ambiguous statute, it is not authorized to rewrite the statute. It must simply declare what is, in terms or in substance, contained in the statute. [Citation.]" (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 749.)

The foregoing rules of statutory construction are subject to specific rules that apply to particular types of statutes. The specific rule relevant in this case provides that any statutory exception to competitive bidding requirements for government contracts are to be *strictly* construed. (*Unite Here Local 30 v. Department of Parks & Recreation* (2011) 194 Cal.App.4th 1200, 1209; see 45A Cal.Jur.3d (2008) Municipalities, § 524, p. 301 [exception to competitive bidding should be strictly construed and restricted to circumstances that truly satisfy the statutory criteria].)

## II.    EXCEPTION TO COMPETITIVE BIDDING—FIRST CAUSE OF ACTION

### A.    Background

School districts can procure new facilities in various ways based on (1) different methods for financing the project and (2) different delivery methods for the construction.

8

### 1. *Traditional Financing and Delivery*

The traditional method for financing new school facilities is for school districts to obtain voter approval for the issuance of general obligations bonds and then use the proceeds from the bonds to pay for the construction. (62 Ops.Cal.Atty.Gen. 209, 210 (1979).)

The traditional delivery method for new school facilities is referred to as design-bid-build, which involves three separate steps. (See 10 Miller & Starr, Cal. Real Estate (3d. ed. 2010) § 27:27, p. 27-143.) First, the school district hires an architect to design the project. Second, the district uses the design in its request for competitive bids from construction firms. Third, the winning bidder builds the project.

School construction contracts are a type of public works contract subject to the competitive bidding process unless an exception applies. (See Pub. Contract Code, § 20111, subd. (b).) Competitive bidding is favored by a strong public policy ""''to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous marketplace competition.'" [Citation.]" (*Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1256-1257.)

### 2. *Lease-Leaseback Delivery and Financing Method -- Section 17406*

In 1957, the Legislature authorized another method for financing and delivery of new school facilities and made it exempt from the competitive bidding process. (Stats. 1957, ch. 2071, § 1, pp. 3682-3687.) This method, the crux of this appeal, has been referred to as a lease-purchase, but is now referred to as a "lease-leaseback" arrangement.[6] (See 56 Ops.Cal.Atty.Gen. 571, 572 (1973); *Los Alamitos Unified School Dist. v. Howard Contracting, Inc.* (2014) 229 Cal.App.4th 1222, 1224 (*Los Alamitos*).)

---

[6] A good description of the use of a lease-leaseback arrangement for a public construction project is set forth in *City of Desert Hot Springs v. County of Riverside* (1979) 91 Cal.App.3d 441, 447-449.) There, the city leased land to a contractor for 50 years and the contractor subleased the completed city hall and public library back to the city for 15 years, with options for the city to purchase the buildings after five and 10

Under the lease-leaseback method, the school district leases land that it owns to a construction firm for a nominal amount ($1.00) and the construction firms agrees to build school facilities on that site. (§ 17406(a)(1).)[7] The construction firm builds the facilities and leases them back to the school district for a specified time at a specified rental amount. Thus, the "leaseback" part of the arrangement involves the construction firm acting as landlord of the newly constructed facilities and the school district acting as the tenant. At the end of the lease, title to the new facilities must vest in the school district. (§ 17406(a)(1).)[8]

Under this financing method, the builder finances the project (probably with assistance from a third party lender) and is paid over the term of the lease, which can last 40 years. (§ 17403; Stats. 1957, ch. 2071, p. 3683 [former § 18353].) The economic reality of the lease-leaseback arrangement is that the builder carries both the cost of construction and financing while the school district compensates the builder with a stream of payments spread over a specified period—namely, the term of the lease. However, the parties to a lease-leaseback arrangement could achieve the same economic effect (i.e., stream of payments) and end result (i.e., the construction of facilities eventually owned by the district) without using a lease-leaseback arrangement. The same terms governing the construction and payment could be adopted in a traditional

years. (*Id*. at pp. 444-445.) The case also illustrates the contractor's use of the site lease and leaseback as security for a construction loan with a pay-off period equal to the term of the leaseback. (*Id*. at p. 445.)

[7] Since its adoption in 1957, this section has been numbered 18355 (1957-1959), 15705 (1959-1976), 39305 (1976-1996), and 17406 (1996 to present). (Stats. 1957, ch. 2071, § 1, p. 3683; Stats. 1959, ch. 2, § 1, pp. 1086-1087; Stats. 1976, ch. 1010, § 2, p. 3167; Stats. 1996, ch. 277, § 3 p. 2126.)

[8] This type of lease-leaseback arrangement should not be confused with the type of arrangement authorized by the Leroy F. Greene State School Building Lease-Purchase Law of 1976, which involves state funding of construction. (§§ 17000-17066.)

construction contract, without a lease of the site and a leaseback of the facility, that included a long-term payment plan requiring the exact same payments as would have been contained in the lease-leaseback arrangement.

Consequently, we consider why the Legislature chose a complicated lease-leaseback structure for builder-financed construction. The answer appears to be related to (1) a constitutional provision that prohibited counties, cities and school districts from incurring any indebtedness or liability exceeding the amount of one year's income without the assent of two-thirds of its voters and (2) the California Supreme Court's determination that leases do not create an indebtedness for the aggregate amount of all installments, but create a debt limited in amount to the installments due each year. (See *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 [applying former Cal. Const. art. XI, § 18] (*Offner*).) Thus, the Legislature adopted the lease-leaseback structure to create a way for school districts to pay for construction over time and avoid the constitutional limitation on debt. (See former § 18364 [amount of rental a district agrees to pay during any one year is an obligation of such district for such year only]; Stats. 1957, ch. 2071, §1, p. 3686.)

Therefore, the formalities of the lease-leaseback arrangement were important to the Legislature in 1957 because of their effect on the project's financing. Specifically, the formalities spread the school district's liability for the construction and carrying costs over the term of the leaseback and limited the amount of debt attributed to the district for any one year.

Next, we consider each component of a traditional lease-leaseback arrangement and the function of that component. The "lease" part of the lease-leaseback arrangement—that is, the agreement pursuant to which the school district leases real estate it owns to a construction firm for $1.00 for the purpose of building new facilities on that real estate—serves three functions. First, the site lease gives the contractor a possessory or leasehold interest in the real estate so that the contractor holds sufficient

11

property rights or interests to serve as the foundation for the leaseback. The fact the contractor holds these rights to the land lends weight and legitimacy to the leaseback and helps avoid the constitutional limitation on debt exceeding one year's income. (See *Offner*, *supra*, 19 Cal.2d at p. 486 [the aggregate amount of payments under a subterfuge lease are a present liability for purposes of the constitutional limitation on debt].) Second, the site lease solidifies the bundle of property and contractual rights (particularly the rental payments under the leaseback) that the construction firm can use as collateral to obtain third party financing. (See fn. 6, *ante*.) Third, the site lease formalizes the contractor's right to enter and occupy the location while building the new facilities. This last function is insignificant compared to the other two because California law implies into every construction contract a covenant that the owner will provide the contractor timely access to the project site. (*Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 50.)

The "leaseback" part of a lease-leaseback arrangement is the mechanism by which (1) the contractor is compensated for its construction services and the cost of financing the project and (2) the school district's obligation to pay for the project is spread over a period of time. The leaseback, with its payment term of up to 40 years, allows a school to acquire facilities that it might not be able to pay for using other financing methods. As a result, the lease-leaseback method opened up a new source of financing for school construction—namely, private sector funding through the contractor and a third party lending money to the contractor. Given the difficulties in obtaining adequate funding for the school construction needs of California in the post-war era, it appears that the primary purpose for the Legislature's adoption of section 17406(a)(1)'s predecessor in 1957 was to provide a new source of financing for school construction. Use of the new source was encouraged by providing an exception to competitive bidding. The exception would have allowed school districts, contractors and lenders to enter into earnest negotiations of the construction and financing arrangements without the concern that the deal would be

12

subsequently derailed by the competitive bidding process. The exception also prevented school districts from being required to balance apples (construction terms) against oranges (financing terms) to determine which proposal was the lowest bid.

Based on the statutory language and historical context, we conclude the primary purpose for the adoption of section 17406(a)(1)'s predecessor was to provide a new source of financing for the construction of schools. We have not located, and the parties have not cited, any sources indicating the formalities inherent in traditional lease-leaseback arrangements had any importance to the design or construction aspects of the project. Thus, to the extent that defendants or an amicus curiae suggest the Legislature intended to create a broad or easily satisfied exception to the competitive bidding process because competitive bidding resulted in slower, more costly construction,[9] we regard this

---

[9] These criticisms of competitive bidding are reflected in the findings made by the Legislature in connection with its adoption of the design-build delivery method of school construction. In 2001, the Legislature added a chapter to the Education Code authorizing the use of "design-build" contracts for school construction. (Stats. 2001, ch. 421, § 1 (Assem. Bill No. 1402); §§ 17250.10-17250.50.) Under the design-build delivery method, both the design and construction work is let to a single entity, which centralizes responsibility for both aspects of the project. (§ 17250.15, subd. (b) [definition of design-build]; see 10 Miller & Starr, Cal. Real Estate, *supra*, § 27:27, p. 27-143.) Design-build contracts are not subject to the competitive bidding requirements in Public Contract Code section 20110, but the school district must (1) invite competitive sealed proposals, (2) award the contract to the responsible bidder whose proposal is determined to provide the "best value" to the school district, and (3) comply with the other requirements in section 17250.25. This selection method has been described as competitive selection.

The Legislature found the benefits of the design-build delivery method "include accelerated completion of the projects, cost containment, reduction of construction complexity, and reduced exposure to risk for the school district." (§ 17250.10, subd. (b).) Also, school districts may benefit "by shifting the liability and risk for cost containment and project completion to the design-build entity." (*Ibid*.) The Legislature also declared its intent "that design-build procurement does not replace or eliminate competitive bidding." (§ 17250.10, subd. (f).)

The design-build delivery method was not utilized for the current project and, therefore, has no direct application to this case.

13

view of Legislative intent as unsupported by legislative history, historical context, or the concerns being addressed in 1957.

In the future, a Legislature might balance the various costs and benefits associated with competitive bidding and with lease-leaseback arrangements and find there are efficiencies that justify excepting lease-leaseback arrangements from competitive bidding even when those arrangements do not provide financing for the construction. While the Legislature is free to make such a finding and amend the statute, we cannot treat recent criticism of competitive bidding as providing insight into the intent of the Legislature in 1957.

Our view that obtaining a new source of school financing was the primary purpose of the lease-leaseback provisions in sections 17400 through 17425 is supported by *Morgan Hill Unified School Dist. v. Amoroso* (1988) 204 Cal.App.3d 1083, which described former sections 39300 through 39325 (the predecessors of §§ 17400-17429) as authorizing a "method for financing school construction." (*Morgan Hill, supra,* at p. 1086.) Similarly, the Attorney General referred to former sections 39300 through 39305 as a construction funding method. (62 Ops.Cal.Atty.Gen., *supra,* at p. 210.)

Although the lease-leaseback delivery method was authorized in 1957, an alternate form has been growing in use throughout California over the past 15 years. This variation of the lease-leaseback arrangement is the type used by Fresno Unified and Contractor in this case. Under this alternate approach, the school district pays for the construction (using local bond funds) as it progresses, with the final payment being made when construction is completed. As a result, the school district does not occupy and use the new facilities as a rent-paying tenant for a set length of time. Because the school district pays for the construction as it is completed, this alternate approach cannot be characterized as a method of financing the construction of new school facilities.

14

B.  Text of Section 17406

Section 17406 gives school boards the authority to lease school property to another under an instrument providing for the construction of buildings on the property. Specifically, section 17406 provides:

> "(a)(1) *Notwithstanding Section 17417*, the governing board of a school district, *without advertising for bids*, may let, for a minimum rental of one dollar ($1) a year, to any person, firm, or corporation any real property that belongs to the district if the instrument by which this property is let requires the lessee therein to construct on the demised premises, or provide for the construction thereon of, a building or *buildings for the use of the school district during the term of the lease*, and provides that title to that building shall vest in the school district at the expiration of that term.  The instrument may provide for the means or methods by which that title shall vest in the school district prior to the expiration of that term, and shall contain other terms and conditions as the governing board may deem to be in the best interest of the school district."  (Italics added.)

C.  The Exception Includes Facilities Leases

An initial question of statutory construction raised by the parties is whether section 17406 creates an exception to competitive bidding for *both* the lease and the leaseback. Davis contends the exception applies only to the Site Lease and, therefore, the Facilities Lease (i.e., the leaseback) is subject to competitive bidding.

This specific question of statutory construction was addressed by the court in *Los Alamitos*, *supra*, 229 Cal.App.4th 1222.  The court interpreted section 17406(a)(1)'s exception to competitive bidding as applying to the entire lease-leaseback arrangements, not just the site lease.  (*Los Alamitos, supra,* at pp. 1224, 1229.)  The text relied upon for this interpretation included the phrases "'without advertising for bids'" and "'[n]otwithstanding section 17417 ….'"  (*Id.* at p. 1227.)  The reference to section 17417 is significant because that section provides that leases entered into by school districts are subject to competitive bidding.  The exception to competitive bidding was extended to facilities leases based on the language referring to an instrument that requires the contractor "to construct on the demised premises … a building or buildings for the use of

15

the school district ….” (§ 17406(a)(1).)  In *Los Alamitos*, the facilities lease provided for the construction of new facilities and the leasing of those facilities to the school district. As a result, the court concluded the facilities lease came within the statute's exception to competitive bidding.  (*Los Alamitos, supra,* at pp. 1224, 1229.)

We agree with the statutory interpretation that the exception to competitive bidding in section 17406(a)(1) is not limited to site leases.  (*Los Alamitos*, *supra*, 229 Cal.App.4th at pp. 1224, 1229.)

First, the ordinary meaning of the word “notwithstanding” is “in spite of.” (Webster's 3d New Internat. Dict. (1993) p. 1545, col. 3.)  It is well established that the phrase “notwithstanding any other provision of law” is a term of art that expresses a legislative intent to have the specific statute control despite the existence of other law that might govern.  (*People v. Harbison* (2014) 230 Cal.App.4th 975, 985.)  Therefore, we conclude the phrase “[n]otwithstanding Section 17417” means the bidding procedures set forth in section 17417 do not apply to agreements covered by section 17406(a)(1).  The phrase “without advertising for bids” provides a further indication that competitive bidding is not required for agreements falling with section 17406(a)(1).

Second, the exception created by section 17406(a)(1) can reach both site leases and facilities leases, provided they meet the statutory criteria.  The reference to an instrument that requires the lessee under a site lease “to construct on the demised premises … a building or buildings for the use of the school district” clearly encompasses the construction services provided by a contractor to a school district under a facilities lease.  (§ 17406(a)(1).)  Therefore, a facilities lease that specifies the terms of construction is eligible for the exception.

The interpretation that the exception can apply to the entire lease-leaseback arrangement is confirmed by the Attorney General's statutory construction of the predecessor of section 17406, former section 15705.  (56 Ops.Cal.Atty.Gen., *supra,* at pp. 579-581; see Stats. 1959, ch. 2, § 1, pp. 1086-1087.)  Under the heading “*Leasing a*

16

*completed school building*," the Attorney General discussed the statutory scheme and opined:

> "It is concluded that the Legislature excluded an arrangement entered into under section 15705 from the notice and bid requirements. Because a school district is not required to obtain bids for lease arrangements under section 15705, it may lease its property for purpose of permitting the construction thereon of school buildings which the district will lease at such rental rates as the governing board deems in the best interests of the district without reference to competitive bidding." (56 Ops.Cal.Atty.Gen., *supra*, at p. 581.)

Based on the foregoing, we reject Davis's argument that the exception to competitive bidding in section 17406(a)(1) includes only site leases and excludes all leases under which a school district obtains newly built facilities from a construction firm, such as the Facilities Lease in this case.

The foregoing statutory interpretation does not resolve all the questions presented in this case about the meaning and application of section 17406(a)(1). The parties' arguments raise questions about whether the Facilities Lease satisfied the criteria set forth in section 17406(a)(1) and, as a result, qualified for the exception to the competitive bidding process. These arguments present issues regarding the proper interpretation of section 17406(a)(1) and how to apply that interpretation to the facts alleged in the FAC. These additional issues of statutory construction, and the related issues of the sufficiency of the taxpayer's allegations, were not addressed in *Los Alamitos*, *supra*, 229 Cal.App.4th 1222 or any other published decision.

### D. Satisfaction of the Exception's Criteria

Davis's first cause of action includes the legal theory that the exception to competitive bidding in section 17406 only applies to genuine or true leases. This legal theory presents an issue of statutory construction. Specifically, does section 17406(a)(1) require the leases in a lease-leaseback arrangement to be genuine to qualify for the exception? If this statutory construction is adopted, we also must address whether

17

Davis's factual allegations are sufficient to support his claim that the Facilities Lease was not a genuine lease.

### 1. Statute Requires a Genuine Lease and Financing

Our interpretation of the statute begins with its words. Generally, the Legislature uses words to indicate substance, not merely as labels. For example, in *Williams v. Superior Court* (1993) 5 Cal.4th 337, the court refused to interpret a statute protecting law enforcement "investigatory" files from disclosure to mean that any file labeled "investigatory," regardless of its nature, was shielded from disclosure. (*Id*. at p. 355.) Based on the principle that words indicate substance, we conclude the word "lease" used in section 17406(a)(1)'s phrase "buildings for the use of the school district during the term of the lease" means something more than a document designated by the parties as a lease. Rather, the Legislature chose the term to indicate the substance of the transactions that are eligible for the exception.

This interpretation is consistent with the way courts treated the concept of a lease when section 17406(a)(1)'s predecessor was enacted in 1957. (See Stats. 1957, ch. 2071, § 1, p. 3683 [former § 18355].) For instance, in *Parke etc. Co. v. White River L. Co.* (1894) 101 Cal. 37, the Supreme Court considered a document that purported on its face to be a "lease." (*Id*. at pp. 38-39.) The court stated: "This paper is not a lease. Calling it a lease did not establish the fact. This is peculiarly a case where there is nothing in a name, for the contents of the paper determine its true character." (*Id*. at p. 39.) The court indicated that the true legal effect and intentions of the parties to an agreement is gathered from all of the language used in the instrument, not just the name given the document or the language in a particular provision. (*Id*. at pp. 39-40; see *San Francisco v. Boyle* (1925) 195 Cal. 426, 433-438; see also *Heryford v. Davis* (1880) 102 U.S. 235, 244 [form of an instrument is of little account; the legal effect of the whole is analyzed].)

Moreover, this well-established disregard for labels in favor of an examination of the substance of a document was applied by the California Supreme Court to a public

18

works contract 15 years before the Legislature enacted section 17406(a)(1)'s predecessor. In *Offner*, *supra*, 19 Cal.2d 483, the court considered whether a proposed agreement for the construction and leasing to the city of a rubbish incinerator was unconstitutional because it would create a debt in the year of its execution that exceeded the revenue then available to the city. (*Id*. at p. 484.) The court recognized that the proposed agreement, though designated as a "lease," might be a subterfuge. (*Id*. at p. 486.) Consequently, the court analyzed the agreement's terms and the intention of the parties before it concluded the proposed agreement constituted "in reality a lease with reasonable terms and option to purchase" that did not violate the yearly debt restriction in the California Constitution. (*Id*. at pp. 486-487.)

The case law that existed prior to 1957 also leads us to conclude that the Legislature used the word "lease" to indicate the substance required, not simply as a label. (See Civ. Code, § 3528 [the substance-over-form principle].) In addition, our view that the statutory exception is available only for genuine leases is supported by the principle that exceptions to competitive bidding requirements "should be strictly construed and restricted to circumstances which truly satisfy the statutory criteria." (*Marshall v. Pasadena Unified School Dist*., *supra*, 119 Cal.App.4th at p. 1256.) Thus, to "truly satisfy the statutory criteria" in section 17406(a)(1) requires a true lease, not simply a traditional construction contract designated as a lease by the parties.

This interpretation of section 17406(a)(1) is not contradicted by legislative history. Defendants have provided, and we have located, no legislative history stating or implying that the criteria for the exception to competitive bidding is satisfied by any document the parties have labeled a lease.[10]

---

[10] Our review of legislative history did not uncover any material useful in deciding the questions of statutory interpretation presented by this case. Consequently, we did not take judicial notice of any legislative history on our own motion. (See Evid. Code, § 459.)

In summary, our review of the entire legislative scheme, the ostensible objects it seeks to achieve, the evils to be remedied, and the underlying public policies lead us to conclude the word "lease" refers to the substance of the transaction and means more than a document designated a lease by the parties. Moreover, to fulfill the primary statutory purpose of providing financing for school construction, the arrangement must include a financing component. (See pt. II.A.2, *ante*.)

### 2. *Relevant Factors*

The conclusion that the leaseback must be a true "lease" to satisfy the criteria in section 17406(a)(1) leads to the question of what factors are relevant to determining the true nature of an arrangement and whether it is a "lease" providing financing for purposes of section 17406(a)(1).

We conclude the true legal effect of the leaseback in question is based on the all the terms of the document. (See *Parke etc. Co. v. White River L. Co.*, *supra*, 101 Cal. at p. 39.) Provisions in the document that are significant include those that define (1) who holds what property rights and when those rights and interests are transferred between the parties and (2) the amount and timing of the payments. (See *Offner*, *supra*, 19 Cal.2d at p. 486.) The payment provisions, particularly the length of the period over which payments are made, are important in this context because the primary purpose of the legislation was to provide a source of financing for school construction and the payment provisions will show whether the project is being financed through the contractor or whether the school district is paying for the project by using funds from other source.

### 3. *Sufficiency of the Allegations of a Subterfuge Lease*

Paragraph 24 of the FAC alleges that the Lease-Leaseback Contracts "are merely a sham and subterfuge to avoid the requirements" in the Public Contract Code for competitive bidding. It also alleges the payments required by the Facilities Lease were are not real lease payments because they "(1) last only as long as the duration of the construction; (2) are variable based upon the value of construction work performed by

20

CONTRACTOR prior to the date of payment; (3) do not provide for any financing of the work by CONTRACTOR (because its obligation to pay others who are actually providing the labor, equipment, materials and services for the construction of the Project is contingent upon it first receiving payment for the same from the DISTRICT); (4) the lease payments end concurrently with the completion of construction of the Project by CONTRACTOR; (5) the Project is being performed and administered in a manner consistent with [the statute governing competitive bidding] rather than with Education Code §§ 17400-17429; (6) the DISTRICT is withholding retention of its payments to CONTRACTOR and requiring CONTRACTOR to provide payment and performance bonds; (7) the DISTRICT does not have the right or practical ability to have beneficial occupancy of the demised premises during the term of the Facilities Lease to use them for their intended purposes."

These allegations are supported by the contents of the Site Lease and the Facilities Lease and their attachments, such as the Construction Provisions, which were included in the FAC as exhibits and incorporated by reference. Therefore, the terms of the Site Lease and the Facilities Lease are before this court, which assists our analysis of the true character of the transaction. (See pts. II.D.1 & II.D.2, *ante*.)

First, we give little weight to the name "Facilities Lease" in evaluating the true character of that document.

Second, we conclude the terms in the Facilities Lease regarding the construction, payment, use, occupancy, possession and ownership of the new facilities adequately support Davis's allegation that the arrangement is not a true lease that provided financing for the project.

The Facilities Lease included Contractor's agreement to build facilities for Fresno Unified in exchange for a guaranteed maximum price of $36.7 million. The amount of Fresno Unified's monthly payments to Contractor were based on the progress of the construction. The final payment for the construction became due upon the completion

21

and acceptance of the construction. Once the final payment was made, both the Facilities Lease and the Site Lease terminated.

Generally, the payment terms set forth in a contract are an important part of the substance of a transaction and directly relevant to whether the transaction is a true lease or a purchase. (See *Offner*, *supra*, 19 Cal.2d at p. 486.) Here, the payment terms were identified in the Construction Provisions as progress payments for construction services and the amount paid each month was determined by the value of construction services completed, less a 5 percent retention. This type of payment schedule is common in construction contracts. (See 4 Miller & Starr, Cal. Real Estate Forms (2d ed. 2006) § 4:4, pp. 36-61 [90% progress payments and a 10% retention used in construction agreement based on cost plus a percentage fee of the guaranteed maximum price].) In contrast, payments made under a lease usually are correlated to a period (e.g., monthly) during which the lessee occupies and uses the real property. (See Black's Law Dictionary, *supra*, p. 970 [defines lease as a "contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usu. rent"].)

Consequently, the substance of the payment terms in the Facilities Lease is that of compensation for construction, not payment for a period of use of the facilities. Moreover, the payment terms support the allegation that Contractor did not provide any financing to Fresno Unified under the Facilities Lease. Thus, the payment terms and the lack of financing support the allegation that the Facilities Lease was not a genuine lease.

Besides the payment terms, the provisions in the Facilities Lease addressing Fresno Unified's right to occupy and use of the new facilities and its ownership of those facilities shows the true character of the Facilities Lease is something other than a lease. The Facilities Lease stated that, during its term, Fresno Unified would obtain title to the project as construction progresses and corresponding payments were made to Contractor. Also, any remaining right, title or interest in the project and site was transferred to Fresno

22

Unified upon it making the final payment. Thus, the combination of a relatively short payment schedule and the transfer of title when the final payment was made meant that (1) Contractor never acted in the capacity of a landlord holding rights to real property occupied by a tenant and (2) Fresno Unified never occupied and used the new facilities as a tenant. In addition to these provisions in the Facilities Lease, Davis specifically alleged that Fresno Unified did not have the right or practical ability to occupy and use the new facilities during the term of the Facilities Lease.

The provisions about use, occupancy and title, and the fact that Fresno Unified never occupied and used the project before making its final payment, provide sufficient support for Davis's legal theory that the substance of the transaction was a traditional construction contract and not a true lease that included a financing component. (Cf. 4 Miller & Starr, Cal. Real Estate Forms, *supra*, § 4:5, p. 115 [provision in construction contract addressing title to labor, materials and equipment states all title thereto will pass to the owner upon receipt of payment by contractor].)

Therefore, we conclude that Davis's allegations are sufficient to state a cause of action for a violation of the competitive bidding requirements in section 17417 or Public Contract Code section 20111.

### 4. Use During the Term of the Lease

Davis's first cause of action also alleges the Lease-Leaseback Contracts violated the statute because they did not require Contractor "to construct on the demised premises … buildings for the use of the school district *during the term of the lease*." (§ 17406(a)(1), italics added.) Davis interprets this statutory text to mean Fresno Unified was required to use the newly constructed buildings "during the term of the lease." He contends he adequately alleged that Fresno Unified failed to satisfy this criterion. This legal theory presents other issues of statutory interpretation that have not been addressed in a published decision.

23

Our analysis of the statutory language begins with the meaning of the word "use" that appears in the prepositional phrase "for the use." In the context of a building, we conclude "use" refers to the occupation and utilization of the building in school operations.

Next, we consider the meaning of the prepositional phrase "of the school district," which follows immediately after the phrase "for the use." (§ 17406(a)(1).) We conclude the phrase "of the school district" signals who must "use" the buildings constructed on the leased premises. Thus, the wording "for the use of the school district" is the equivalent of the phrase "for the school district's use." Consequently, the building constructed pursuant to the instrument referred to in section 17406(a)(1) must be used by the school district and not another entity.

The phrase "during the term of the lease" follows immediately after the wording "for the use of the school district." (§ 17406(a)(1).) We conclude this phrase modifies the word "use" by identifying *when* the school district's use must occur. Defendants appear to argue that the phrase modifies only "to construct" and its sole function is to identify when the construction must occur. We reject this interpretation based on the syntactic canon of statutory construction labeled by Scalia & Garner, Reading Law: The Interpretation of Legal Text (2012) as the nearest-reasonable-referent canon: "When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier[11] normally applies only to the nearest reasonable referent." (*Id*. at p. 152.) In section 17406(a)(1), the terms "to construct" and "for the use" are not parallel phrases. Thus, under the nearest-reasonable-referent canon, the language in the phrase "buildings for the use of the school district during the term of the lease" should be interpreted so that the words "during the term of the lease" modify "the use of the school

---

[11] Here, the phrase in question is postpositive because it is positioned after both the word "construct" and the word "use." (Scalia & Garner, *supra,* at p. 148.)

24

district"—the phrase to which they are nearest. Consequently, for a leaseback arrangement to qualify for the exception to the competitive bidding requirement, there must be a lease term during which the school district, as tenant, makes use of the newly built facilities. If, from a substantive point of view, there is no period during which the school district uses the new facilities while leasing them from the construction firm, the arrangement does not conform to the requirements of section 17406 and, therefore, would be subject to the competitive bidding procedures.

This interpretation is consistent with the Attorney General's statutory construction of the predecessor section 17406, former section 15705. (56 Ops.Cal.Atty.Gen., *supra,* at pp. 579-581; see Stats. 1959, ch. 2, § 1, pp. 1086-1087.) Under the heading "*Leasing a completed school building,*" the Attorney General stated:

> "Because a school district is not required to obtain bids for lease arrangements under section 15705, it may lease its property for the purpose of permitting *the construction thereon of school buildings which the district will lease* at such rental rates as the governing board deems in the best interests of the district without reference to competitive bidding." (56 Ops.Cal.Atty.Gen., *supra,* at p. 581, italics added.)

Defendants argue that because the legislation identifies a maximum term of 40 years (§ 17403) and provides for no minimum term for leases related to the construction of buildings, this court should infer that the Legislature did not intend a minimum length for the leaseback of the newly built facilities from the construction firm to the school district. (See *Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 389 [*expressio unius est exclusio alterius* is a maxim of statutory construction that means the express inclusion of one thing implies the exclusion of the other].) This maxim of statutory construction supplies an inference about intent based on legislative silence. Here, section 17406(a)(1) contains an explicit requirement that the school district use the new buildings "during the term of the lease." The Legislature's reference to "the term of the lease" and the principle that words indicate substance support the inference that the

25

Legislature intended this language to have substance, rather than merely specifying a formal or a de minimis requirement.**[12]**

In summary, a lease-leaseback arrangement qualifies for the exception to competitive bidding created by section 17406(a)(1) only if the instrument containing the leaseback requires the construction firm "to construct on the demised premises … a building or buildings for the use of the school district during the term of the lease." We interpret this statutory language to mean the leaseback must have a term during which the school district uses the new buildings.

### 5. *Sufficiency of the Particular Facts Alleged*

The next step of our analysis is to review the FAC to determine whether Davis has alleged facts sufficient to support his legal theory that the Facilities Lease was subject to competitive bidding because Fresno Unified failed to satisfy the statutory criterion for use of the buildings by the school district "during the term of the lease." (§ 17406(a)(1).)

Paragraph 24 of the FAC alleged that Fresno Unified "does not have the right or practical ability to have beneficial occupancy of the demised premises during the term of the Facilities Lease to use them for their intended purposes."

This allegation, which was made before the completion of the project and termination of the leases, directly addresses whether the Facilities Lease provided for the construction of "buildings for the use of the school district during the term of the lease." (§ 17406(a)(1).) Treating this allegation as true for purposes of the demurrer (*Dinuba*,

---

**[12]** The allegations in the FAC, which were confirmed by Fresno Unified's counsel during oral argument, do not present a situation where the school district used the project during a very short leaseback period. Thus, we are not presented with the question of how long the leaseback period must be to qualify for the exception in section 17406, an issue that could be rephrased as how long a district use and occupy the project as a tenant before the "true character" of the transaction is a lease and not a traditional construction contract. (See *Parke etc. Co. v. White River L. Co.*, *supra,* 101 Cal. at p. 39; Civ. Code, § 3533 [the law disregards trifles]; *Miller v. Williams* (1901) 135 Cal. 183, 184 [de minimis principle].)

*supra*, 41 Cal.4th at p. 865), we conclude Davis has adequately alleged the Facilities Lease did not satisfy a criterion of section 17406(a)(1) because it did not provide for Fresno Unified to use the new constructed buildings during the term of the lease.

### E. Summary Regarding Competitive Bidding

We conclude the first and third causes of action[13] adequately allege that defendants violated the statutory requirements for competitive bidding because the Lease-Leaseback Contracts failed to "truly satisfy the statutory criteria" for the exception to competitive bidding set forth in section 17406(a)(1). (*Marshall v. Pasadena Unified School Dist.*, *supra*, 119 Cal.App.4th at p. 1256.) Specifically, Davis has alleged (1) the exception is available only for genuine leases and the subject leaseback agreement was simply a traditional construction agreement, (2) the Lease-Leaseback Contracts did not include a financing component for the construction of the project, and (3) the Lease-Leaseback Contracts did not provide for Fresno Unified's "use" of the new constructed buildings "during the term of the lease." (§ 17406(a)(1).)

## III. IMPROPER USE OF LEASE ARRANGEMENTS WHEN SUFFICIENT FUNDS ARE AVAILABLE—FIFTH CAUSE OF ACTION

### A. Allegations and Legal Theories

The FAC's fifth cause of action, like his first, alleges the Lease-Leaseback Contracts were ultra vires and void because they did not comply with certain requirements in the Education Code. These requirements are derived from two separate legal theories or interpretations of the Educations Code.

---

[13] The first cause of action states a claim based on the legal theory that defendants failed to comply with the requirements of section 170406(a)(1) and, therefore, failed to qualify for the exception to the competitive bidding requirements. The third cause of action alleged defendants violated the competitive bidding requirements in section 17417. Thus, for purposes of the demurrer, we regard the causes of action as setting forth overlapping legal theories and will not address the third cause of action separately.

*1.       The No-Available-Funds Theory*

The first legal theory asserts the lease-leaseback method for completing a school construction project "is only available for use by school districts in California as a means to finance the cost of construction over time when they do not have sufficient immediate funds available to them to cover the cost of construction." Davis alleged this requirement was violated because voter-approved bond sales provided Fresno Unified with "sufficient funds available to it to cover the immediate costs of construction of the Project as they are incurred …."

*2.       Leaseback Must Provide Financing Theory*

The second legal theory asserts that the statutory scheme authorizing lease-leaseback arrangements "requires the cost of construction be advanced and carried over a period of many years by the party to whom the lease-leaseback contracts are awarded."

We will not analyze this legal theory separately because it is part of the first cause of action. (See pt. II.E, *ante*.)

*3.       SAB Report*

Davis supports his legal theory that lease-leaseback arrangements are permitted only when funding is not otherwise available by referring to a Report of the Executive Officer to the State Allocation Board for its January 28, 2004, meeting (SAB Report).[14] The SAB Report was attached to the FAC as exhibit D and states in part:

> "Sections 17400 et al., including [section] 17406, make up Article 2 of Chapter 4 of Part 10.5 of the [Education Code] entitled Leasing Property. It describes the requirements imposed on school districts considering the acquisition of school facilities through lease agreements. As confirmed by the Appeals Court ruling in [*Morgan Hill Unified School District v.*

---

[14]     The State Allocation Board and the staff of the Office of Public School Construction implement and administer California's school facilities construction program, which includes apportioning money from a state fund and determining which schools are eligible to receive funding. (See *Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 473-474.)

*Amoroso, supra,* 204 Cal.App.3d 1083], the article is about financing. In that case the court stated that, 'The Education Code creates the following method for financing school construction.' The court then went on to describe … Sections 39300 through 39325, which are now renumbered as 17400 through 17425. Thus [sections] 17400 through 17425 is a method of financing school construction in which [section] 17406 addresses the mechanism by which the school district can let the property where the construction will take place.

"Staff believes that virtually none of the projects currently using lease-leaseback arrangements actually have financing provided by the developer. If a 'lease agreement' other than the site lease exists at all, it serves no significant purpose other than as a construction contract. The full cost of the project is borne by the district using normal funds it has available for capital projects. Normal progress payments are made to the contractor through the course of construction, and the project is completely paid for by the district at the project completion. The projects are in every regard typical public works projects, except that they have not been competitively bid.

"Since no financing exists in the lease lease-back arrangement (or there is no lease agreement at all), the use of Article 2 appears to be inappropriate."

### 4.    Defendant's Arguments

Defendants argue the express requirements of section 17406 were met in this case. As to the SAB Report, defendants contend the opinions expressed in it should be given little weight because (1) the interpretation of the statutes involves a pure issue of law and this type of interpretation is solely a judicial function; (2) the SAB Report was not formally adopted by the State Allocation Board and was not vetted in accordance with the California Administrative Procedures Act; and (3) subsequent legislation that sought to address some of the issues raised in the SAB Report never became law because of a Governor veto of Assembly Bill No. 1486 (2003–2004 Reg. Sess.).

### B.    Analysis

We reject Davis's legal theory that the statutory scheme restricts the use of lease-leaseback arrangements to situations where the school district does not have sufficient available funds to cover the cost of building the new facilities.

First, there is no express provision in the statutes limiting school district's use of lease-leaseback arrangements to situations where the school district funds are not otherwise available.

Second, Davis has identified no ambiguous provision in the statutes that could be construed in a manner to include such a broad limitation. Although exceptions to competitive bidding are to be narrowly construed, the concept of strict construction does not empower courts to narrow the scope of the statutory exception by imposing conditions or limitations the Legislature did not include in the statute. (See Code Civ. Proc., § 1858 [courts interpreting a statute should not "insert what has been omitted" by the Legislature].)

Third, the views expressed in the SAB Report do not actually include the interpretation advocated by Davis. Specifically, the SAB report does not state that the legislation restricts the availability of the lease-leaseback method to situations where other funding is not available. In other words, the report's reference to a case stating the "Education Code creates the following method for financing school construction" (*Morgan Hill Unified School Dist. v. Amoroso*, *supra*, 204 Cal.App.3d at p. 1086) does not imply that method is allowed only if other methods of financing are not available.

IV.    BREACH OF FIDUCIARY DUTY—SECOND CAUSE OF ACTION

       A.    Allegations

The FAC's second cause of action alleged that Fresno Unified's board had a fiduciary duty to the residents and taxpayers within Fresno Unified and that duty applied to the board's approval of expenditures for a multi-million dollar construction project. The FAC also alleged Fresno Unified's board breached the fiduciary duty by (1) failing to consider less expensive alternatives to the project, (2) failing to consider whether the price was reasonable, (3) failing to exercise due diligence to determine whether the price paid could be lower, (4) knowing the price paid could have been lower, (5) failing to

30

solicit bids for the work, (6) failing to proceed in a manner that would secure the best price, and (7) failing to proceed in a manner required by law. In short, Davis alleged Fresno Unified's board breached its fiduciary duty by overpaying for the project.

The FAC contends that because Fresno Unified did not comply with its fiduciary duties, the Lease-Leaseback Contracts are ultra vires, void and unenforceable and "all money paid thereunder must be returned by CONTRACTOR to DISTRICT."

B.    Breach of Fiduciary Duty

In litigation between private parties, the elements of a cause of action for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) a breach of the fiduciary duty, and (3) damage proximately caused by the breach. (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 932.) When a claim for breach of fiduciary duty is asserted against a public official by the Attorney General or a taxpayer, the damage element can be satisfied by alleging the official obtained profits from the unauthorized act. (*People ex rel. Harris v. Rizzo* (2013) 214 Cal.App.4th 921, 950 [breach of fiduciary duty claim stated against council members who paid themselves excessive salaries].) In these cases, the relief available is restitution, which can include the disgorgement of profits obtained by the public official. (*Id*. at p. 951, fn. 30.)

C.    Analysis

Here, the FAC requests that Contractor return all money paid to it under the Lease-Leaseback Contracts, but does not allege Contractor was subject to a fiduciary duty. As to the persons who allegedly breached their fiduciary duty (i.e., Fresno Unified's board), the FAC does not allege they profited from the transactions and does not request restitution or the disgorgement of profits. Furthermore, the relief sought for the alleged breach of fiduciary duty is against Contractor, a party who did not have a fiduciary duty. Accordingly, the second cause of action failed to allege facts sufficient to state a claim for breach of fiduciary duty. (See *People ex rel. Harris v. Rizzo*, *supra*, 214

31

Cal.App.4th at p. 950 [city's police chief who negotiated excessive salary did not breach a fiduciary duty because any duty would have arisen only after the contract was executed; demurrer properly sustained as to cause of action against him].)

V.      CONFLICT OF INTEREST—FOURTH CAUSE OF ACTION

Davis's fourth cause of action attempts to state a conflict of interest claim based upon (1) common law conflict of interest principles, (2) Government Code section 1090 et seq. and (3) the provisions of California's Political Reform Act of 1974, Government Code section 81000 et seq.

A.      Political Reform Act of 1974

1.      *Conflict of Interest Provisions*

Chapter 7 of the Political Reform Act of 1974[15] addresses conflicts of interest by public officials. This chapter contains Government Code section 87100, which states: "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

The term "public official" is defined for purposes of the Political Reform Act of 1974 to mean "every member, officer, employee or *consultant* of a state of local government agency." (Gov. Code, § 82048, subd. (a), italics added.)

2.      *Allegations in FAC*

The FAC contains the following allegations. Contractor had a prior contract with Fresno Unified that created a conflict of interest and, therefore, precluded Contractor from being awarded the Lease-Leaseback Contracts. Pursuant to the prior contract,

---

[15]     The act contains Government Code sections 81000 through 91014 and is designated title 9 of that code. Chapter 7 contains eight articles consisting of Government Code sections 87100 through 87505. This detail about title 9 and its chapters is provided because the definition of "public official" in chapter 2 is used to determine the reach of the conflict of interest provisions in chapter 7.

32

Contractor acted as a consultant and provided Fresno Unified with professional preconstruction services related to the project, which included the development of plans, specifications and other construction documents for the project. Contractor was paid by Fresno Unified for consulting on the project and had a hand in designing and developing plans and specifications by which the project is being constructed.

The FAC referred to Government Code section 81000 et seq., but not the specific provision that contains the prohibition against conflicts of interest, Government Code section 87100. The FAC also cited the definition of "public official" in Government Code section 82048, subdivision (a).

### 3. The Demurrers, Opposition and Replies

The demurrers of Fresno Unified and Contractor address the conflict of interest claim under the Political Reform Act of 1974 by asserting (1) it was enacted so that public officials would perform their duties in an impartial manner without bias caused by their own financial interest and (2) elected officials are required to file annual statements disclosing their financial interests. Defendants argued Davis did not and could not allege Contractor was an elected official or even a designated official to whom the act would apply. They quote a bylaw of Fresno Unified that requires persons in designated positions to file a full statement of economic interest and then assert Contractor is not one of the designated officials. From this foundation, defendants contend the "Political Reform Act of 1974 simply does not apply to [Contractor] in this case."[16]

In his opposition, Davis cited Government Code section 87100, the conflict of interest provision in the Political Reform Act of 1974, and relied on its requirement that no public official shall participate in making a governmental decision in which the

---

[16] Defendants cite Government Code sections 87203 (annual statement) and 87207 (income statement). These citations are off the mark because the sections are in the article addressing disclosure, not the article containing the prohibition against a conflict of interest.

33

official knows he has a financial interest. One implication of Davis's reference to "no public official" is that the conflict of interest provision is not limited to the *elected* and *designated* officials described in the demurrers.

Defendants' reply papers ignored the statutory language in Government Code section 87100 and the definition of "public official" in Government Code section 82048, subdivision (a) that extends to consultants. The replies reasserted that Davis "has not alleged and cannot allege [Contractor] is an elected official or even a designated official that the Act would apply."

The minute order sustaining the demurrer to the conflict of interest cause of action mentioned Government Code section 1090, but did not refer to Government Code section 87100 or the statutory definition of public official that includes consultants.

### 4. *A Corporate Consultant Is Not a Public Official*

The definition of "public official" in Government Code section 82048, subdivision (a), unambiguously applies to all of the Political Reform Act of 1974, including its prohibition against conflicts of interest. Specifically, Government Code section 82000 states that the definitions set forth in chapter 2 of the Political Reform Act of 1974 govern the interpretation of title 9, which title contains all provisions of the Political Reform Act of 1974. Therefore, the public officials mentioned in the conflict of interest provision include consultants. (See Gov. Code, § 82048, subd. (a) ["public official" defined to include consultants].)

Thus, Davis's allegation that Contractor provided services to Fresno Unified as a paid consultant is sufficient to raise the possibility that Contractor was a "public official" subject to conflicts of interest in Government Code section 87100.

The term "consultant" is not defined by the Political Reform Act of 1974, but the regulations promulgated under the act contain a definition. (See League of California Cities, Cal. Municipal Law Handbook (Cont. Ed. Bar 2014) § 2.114, p. 155 [consultant included in list of key definitions].) A consultant is "an individual who, pursuant to a

34

contract with a state or local government agency [¶] (1) [m]akes a governmental decision …." (Cal. Code Regs., tit. 2, § 18704.6, subd. (a).) The appellate briefing has not mentioned this regulatory definition and, consequently, Davis has not argued the regulation is invalid. (See Gov. Code, § 11342.2 [no regulation is valid unless consistent and not in conflict with the statute].) Therefore, we accept the regulatory definition of "consultant" as valid and applicable to this case.

Davis alleged that Contractor "is, and at all times mentioned was, a California corporation, doing business in the City of Fresno and State of California." As a corporation, Contractor falls outside the regulatory definition of "consultant" that refers to individuals. Therefore, we conclude Contractor is not a "public official" subject to the conflict of interest provisions in the Political Reform Act of 1974.

It follows that the FAC failed to state a cause of action against Contractor for violating the conflict of interest prohibition in Government Code section 87100.

B.    Government Code Section 1090

*1.    Basic Principles Governing Conflict of Interest Claims*

Government Code section 1090, subdivision (a) provides in part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." One of the consequences for a civil violation of this rule is set forth in Government Code section 1092: "(a) Every contract made in violation of any of the provisions of [Government Code] Section 1090 may be avoided at the instance of any party except the officer interested therein."[17]

---

[17]    The term "any party" is not restricted to parties to the contract. Defendants did not base their demurrer on the ground Davis lacked standing to bring the conflict of interest claim under Government Code section 1090 since it is recognized that either the public agency or a taxpayer may seek relief for a violation of section 1090. (E.g., *Thomson v. Call* (1985) 38 Cal.3d 633 [taxpayer suit successfully challenged validity of land transfer

35

Government Code section 1090 "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).) The prohibition is based on the rationale that a person cannot effectively serve two masters at the same time. "'If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality.' [Citation.]" (*Id.* at p. 1073.) Consequently, Government Code section 1090 is designed to apply to any situation that "would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the [public entity concerned]." (*Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 (*Stigall*).) Government Code section 1090's goals include eliminating temptation, avoiding the appearance of impropriety, and assuring the public of the official's undivided and uncompromised allegiance. (*Thomson v. Call, supra,* 38 Cal.3d at p. 648.)

Courts evaluating a conflict of interest claim under Government Code section 1090 must consider "(1) whether the defendant government officials or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable financial interest in that contract, and (3) (if raised as an affirmative defense) whether the cognizable interest falls within any one of section 1091's or section 1091.5's exceptions for remote or minimal interests. [Citations.]" (*Lexin*, *supra*, 47 Cal.4th at p. 1074.)

The breadth of what it means to participate in the making of a contract is illustrated by *Stigall*. In that case, a taxpayer filed an action seeking to have a contract for plumbing work related to construction of a civic center declared invalid. (*Stigall*,

from city council member through intermediaries to city]; see Kaufmann & Widiss, *The California Conflict of Interest Laws* (1963) 36 So.Cal. L.Rev. 186, 200.)

36

*supra*, 58 Cal.2d at p. 566.) The trial court sustained a demurrer to the complaint, concluding the taxpayer failed to allege facts showing a prohibited conflict of interest. The Supreme Court reversed and directed the demurrer to be overruled. (*Id*. at p. 571.)

In *Stigall*, the complaint alleged the member of the city council in charge of the council's building committee owned more than 3 percent of the stock of a plumbing company and the building committee supervised the drawing of plans and specifications for a civic center. (*Stigall*, *supra*, 58 Cal.2d at pp. 566-567.) When the bids for the construction work were received and opened, the council member's plumbing company was the low bidder for the plumbing work. (*Id*. at p. 567.) After objections were made to awarding the contract to the council member's plumbing company, the council rejected all bids and advertised for new round of bidding. (*Ibid*.) Subsequently, the council member resigned and the council awarded the construction contract to a general contractor that had included a sub-bid for the plumbing work from the former council member's plumbing company. (*Ibid*.)

The Supreme Court addressed the timing of the council member's resignation and whether he "made" the contract entered into by the plumbing company. (*Stigall*, *supra*, 58 Cal.2d at pp. 568-569.) The court determined the use of technical terms and rules governing the making of contracts was not appropriate and construed the word "made" broadly in light of the statutory objective to "limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision." (*Id*. at p. 569.) The court concluded the term "made" encompassed the planning, preliminary discussions, and drawing of plans and specification. (*Id*. at p. 571.) Because the former council member had participated in all of these activities involving the contract and was financially interested in the plumbing company, the court concluded the complaint alleged a violation of the conflict of interest provision in Government Code section 1090.

37

*2. Contentions*

Davis contends that the conflict of interest provision in Government Code section 1090 extends to independent contractors and consultants who are involved in the contract process on behalf of the public entity and have an interest in the resulting contract. Davis relies on two decisions that applied the conflict of interest provision to independent contractors and consultants. (See *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1124-1125 (*Hub City*); *California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc.* (2007) 148 Cal.App.4th 682, 693 (*Hanover*).)

Defendants contend *Hub City* and *Hanover* are readily distinguishable from the facts pled in the FAC and, in any event, the expansion of liability adopted in those cases has been harshly criticized by the court in *People v. Christiansen* (2013) 216 Cal.App.4th 1181, at pages 1189 through 1190. Defendants also contend that section 17250.10 demonstrates that the Legislature is not concerned with situations where a single entity acts as both the designer and builder of the same project.[18]

*3. Analysis*

Government Code section 1090 applies to district "officers or employees." The decisions in *Hub City* and *Hanover* extended the conflict of interest prohibition to consultants, but did not address whether, for purposes of Government Code section 1090, *corporate* consultants could be regarded as "officers or employees" of the local agency.

In *Hanover*, the conflict of interest claims were pursued against two individuals and not against the corporation that actually entered into the contact with the public agency. (*Hanover*, *supra*, 148 Cal.App.4th at p. 684.)

---

[18] Fresno Unified and Contractor did not utilize the design-bid procedures contained in sections 17250.10 through 17250.50. Therefore, even if that legislation is interpreted as creating an exception to the conflict of interest provisions, the exception would not apply to Contractor in this case.

In *Hub City*, the appellants challenged the adverse judgment on a conflict of interest claim by arguing that corporate consultants do not owe municipalities a fiduciary duty. (*Hub City*, *supra*, 186 Cal.App.4th at p. 1125.) The court did not decide this argument, concluding that the limited liability company's status as the contracting entity with the city was immaterial because the actions of the company's president fell within the scope of Government Code section 1090. (*Hub City, supra,* at p. 1127.) Thus, the court's decision was based on the fact the president of the consulting company was an "officer" under the statute and his individual actions influenced the city's contracting decisions. (*Id*. at p. 1125.) As to the evidence presented, the court concluded it established that the president's actions fell within the ambit of Government Code section 1090 because he was intricately involved in the city's waste management decisions and proposed franchising the city's waste management decisions. (*Hub City, supra,* at p. 1125.) As a result, the subsequent franchise agreement between the city and another of the president's companies was invalidated.

In summary, the courts in *Hanover* and *Hub City* interpreted the statute broadly to include individuals who were consultants to the public agency, but neither court decided whether the statutory terms "officers" or "employees" should be expanded to include legal entities such as corporations or limited liability companies.

First, we conclude that the stricter definition of the statutory terms adopted by the court in *People v. Christiansen*, *supra*, 216 Cal.App.4th 1181 is appropriate in the context of criminal prosecution, but is not appropriate in the context of civil actions seeking to invalidate a contract with a public entity. In *Stigall*, a civil action, the Supreme Court interpreted the statutory terms broadly to implement to objectives of the conflict of interest statute and did not rely on technical definitions or rules to limit the reach of the statute. Similarly, we conclude that technical definitions of the term "employee" taken from other areas of law should not be used to limit the scope of Government Code section 1090. Therefore, we join the courts in *Hanover* and *Hub City* in concluding that, in civil

actions, the term "employees" in Government Code section 1090 encompasses consultants hired by the local government.

Second, as to whether the word "employees" should be interpreted to exclude corporate consultants, we conclude that corporate consultants should not be categorically excluded from the reach of Government Code section 1090. Such a statutory interpretation would allow the use of the corporate veil to insulate conflicts of interest that otherwise would violate the prohibition against local government officers and employees from making contracts in which they are financially interested. A corporate consultant is as capable of influencing an official decision as an individual consultant. Because the statute's object is to limit the *possibility* of any influence, direct or indirect, that might bear on an official's decision (*Stigall*, *supra*, 58 Cal.2d at p. 570), we conclude the allegations that Contractor served as a professional consultant to Fresno Unified and had a hand in designing and developing the plans and specifications for the project are sufficient to state that Contractor (1) was an "employee" for purposes of Government Code section 1090 and (2) participated in making the Lease-Leaseback Contracts.

Third, the FAC alleged that Fresno Unified and Contractor entered into the Lease-Leaseback Contracts pursuant to which Contractor agreed to build the project for a guaranteed maximum price of $36.7 million. These allegations are sufficient to state that Contractor was "financially interested in" the Lease-Leaseback Contracts for purposes of Government Code section 1090.

In summary, Davis has alleged sufficient fact to state of cause of action for a violation of the conflict of interest provisions in Government Code section 1090. Contrary to defendants' argument, it does not appear that a plaintiff is required to include detailed allegations of actual influence on the decision to award the contract in question. (See *Stigall*, *supra*, 58 Cal.2d 565.) Ultimately, whether Davis will be able to prove Contractor violated the conflict of interest provision of Government Code section 1090

40

will depend upon the facts established by the evidence.  For purposes of demurrer, Davis has alleged sufficient facts to state a cause of action.

### C.  Common Law Conflict of Interest

In *Lexin*, the Supreme Court stated that Government Code section 1090 "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin*, *supra*, 47 Cal.4th at p. 1072.)  The statutes' overlap with the common law rule is not completed because the statutes are concerned with *financial* conflicts of interest and the common law rule encompassed both financial and nonfinancial interests that could result in divided loyalty.  (See *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1171, fn. 18 [Political Reform Act of 1974 focuses on financial conflicts of interest while the common law extended to noneconomic conflicts of interest].)

Because we have concluded the FAC stated a cause of action under Government Code section 1090, it follows that Davis also has stated a common law claim for a conflict of interest.

## VI.  DECLARATORY RELIEF

Davis's seventh cause of action is based on the previously alleged violations of the Education Code and the need for competitive bidding.  This declaratory relief claim depends upon the other causes of action and does not set forth an independent basis for relief.  Because we have determined that some causes of action stated facts sufficient to allege a claim, we will allow the request for declaratory relief to remain part of the litigation.

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its order sustaining the demurrer and enter a new order (1) sustaining the demurrer as to the breach of fiduciary duty claim, the violation of the Political Reform Act of 1974 claim, and the fifth

41

cause of action alleging the use of the lease-leaseback arrangement is improper when funds are available to a school from another source and (2) overruling the demurrer as to the other causes of action.

      Plaintiff shall recover his costs on appeal.


 

                                  _____

                                            Franson, J.

WE CONCUR:

_____
Levy, Acting P. J.


_____
Gomes, J.