Filed 11/27/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALIFORNIA TAXPAYERS ACTION NETWORK,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TABER CONSTRUCTION, INC.,<br><br>    Defendant and Respondent. | A155803<br><br>(Contra Costa County<br>Super. Ct. No. MSC1400996) |

After Mount Diablo Unified School District (School District) hired Taber Construction, Inc. (Taber) to complete a construction project involving modernization of eight school campuses, plaintiff California Taxpayers Action Network sued the School District and Taber generally challenging the School District's use of a lease-leaseback agreement for the construction project. (*California Taxpayers Action Network v. Taber Construction, Inc*. (2017) 12 Cal.App.5th 115, 122 (*California Taxpayers*).) Following successful demurrers, we affirmed the dismissal of most of plaintiff's claims, but we concluded plaintiff's allegations were sufficient to state a single claim against Taber of conflict of interest. (*Ibid.*)

In the surviving claim, plaintiff alleged Taber provided preconstruction services to the School District regarding the project, and a conflict of interest arose when the School District subsequently awarded the contract for the construction project to Taber. Taber moved for summary judgment, the trial court granted the motion, and judgment was entered in Taber's favor. Plaintiff appeals, and we affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying construction project in this case involved heating, ventilation, and air conditioning (HVAC) modernization of five elementary schools and three middle schools owned by the School District. We refer to this construction project as the "HVAC project."

On October 4, 2013, the School District published two requests for qualifications and proposals (RFQ/P's) for its proposed HVAC project.[1] The RFQ/P's "invite[d] responses from qualified firms . . . to enter into agreements with the District for the HVAC Modernization" at the school campuses identified.

The RFQ/P's explained that the School District intended to select a firm (or firms) to complete the modernization project, but the process would involve two contracts entered into at different times. First, the RFQ/P's provided, "[t]he District intends to . . . enter into a PSA [preconstruction services agreement] with the successful firm(s) to partner with the District's staff, Program Manager and Architect to provide preconstruction services that will lead to the Firm providing to the District a Guaranteed Maximum Price (GMP) for the project. The scope of Preconstruction Services will generally consist of reviewing existing documents and site conditions, scheduling, estimating, constructability review, subcontractor bidding, and development of the GMP, as described fully in the Preconstruction services agreement (Attachment B/Exhibit H)."

Second, the RFQ/P's provided that the "District intends to then enter into the lease-leaseback agreement with the successful Firm." Blank lease-leaseback agreements were attached to the RFQ/P's, and the RFQ/P's stated that the successful contractor "shall be required to comply with the terms of these forms."[2]

---

[1] RFQ/P MDUSD 1659 covered HVAC modernization at two middle schools and two elementary schools. RFQ/P MDUSD 1660 covered another group of schools (three elementary schools and one middle school). The RFQ/P's appear to contain identical language on general information, submittal requirements, and the School District's evaluation and selection process.

[2] Education Code section 17406 authorizes school districts to use lease-leaseback agreements in contracting for construction or improvement of school facilities. For a

2

Taber submitted responses for both RFQ/P's, and a School District representative later called Bret Taber, the chief executive officer of Taber, and told him Taber had been selected for the HVAC project.

In November 2013, the School District and Taber entered into the PSA's for the HVAC project. The PSA's included the following introductory language: "WHEREAS, District and Developer intend to enter into a lease-leaseback arrangement for the development of the Project . . . after Developer's performance of its duties as set forth in the Agreement and pending both the approval of the Plans and Specifications by the California Division of State Architect ('DSA') and approval by the District and Developer of the Lease Agreements."

In March 2014, the School District and Taber entered into the lease-leaseback agreement for the HVAC project. The lease-leaseback agreement was made up of a "Master Site Lease" and a "Master Facilities Lease."

*Conflict of Interest Claim*

In the operative complaint, plaintiff alleged the lease-leaseback agreement between the School District and Taber for Taber to complete the HVAC project was illegal because Taber "was legally precluded from being awarded those contracts due to conflicts of interest that arose from [Taber]'s prior contract(s) with the [School District] related thereto."

The "prior contract(s)" plaintiff referred to were the PSA's. Plaintiff alleged, "Under the [PSA's] and other similar other [*sic*] contracts [Taber] was expected and legally required to give its undivided loyalty, honest services and professional advice to [the School District] concerning, inter alia, the scoping, planning, budgeting, design and construction methods/materials to be utilized for the completion of the Projects [i.e., the HVAC project]. Such preconstruction services included, but were not limited to, budgeting, site evaluation, plan review and constructability services, design review, value

discussion of lease-leaseback agreements generally, see *California Taxpayers*, *supra*, 12 Cal.App.5th at pages 122–123, 126–127.

3

engineering, CPM scheduling, construction estimating, staging (project phasing) and assistance in the development of plans and specifications for various [School District] projects including, but not limited to, the Projects."

According to plaintiff, "[i]n performing its duties under the [PSA] . . . [Taber] performed the functions and filled the roles and positions of officers, employees and agents of [the School District] who would ordinarily perform and provide the foregoing professional, design, and financial functions and advise the [School District] relative to same."

Plaintiff stated its theory for the conflict of interest claim generally as follows: "Based on [Taber]'s provision of professional preconstruction services and advice to [the School District] under the [PSA] relative to the Projects and other similar contracts[,] conflicts of interest arose between [Taber] and [the School District] under the common law conflict of interest doctrine applicable to [the District's] contracts, Government Code, Section 1090 et seq., and/or other applicable conflict of interest laws when [Taber] was subsequently awarded the Lease-Leaseback Contracts [i.e., the Master Site Lease and Master Facilities Lease] for the Projects and/or other similar other contracts."

Plaintiff further alleged that the PSA's "created the opportunity for [Taber] to use its position as [the School District's] professional preconstruction service provider under the prior contracts to further . . . its own interests rather than the interests of the [District] under the later contracts."

*Motion for Summary Judgment*

Taber filed a motion for summary judgment arguing (1) completion of the HVAC project rendered plaintiff's claim moot, (2) plaintiff could not prove Taber had actual knowledge of a conflict of interest, (3) there was no conflict of interest because the PSA's and construction contract were essentially formed as one transaction, and (4) Taber was not subject to Government Code section 1090 because it was not a school board member or oversight committee member.

4

As to the third argument,[3] Taber maintained there was no conflicted contract between itself and the School District because the School District contemplated "one fluid transaction in which one contractor would carry out the entirety of the work, but in different phases." In other words, the School District's intent when it published the RFQ/P's was to select "one contractor [to] perform preconstruction services and then perform a lease-leaseback contract with the District."

Relying on the language of the RFQ/P's and PSA's, Taber argued: "The District awarded the PSAs and the Lease-Leaseback Contract to Taber at the <u>same</u> <u>time</u> after analyzing the RFQ/Ps. [Citation.] The work was split into two phases, preconstruction services and construction services, but the District intended to award Taber both phases when the parties entered the PSAs on November 1, 2013. [Citation.] By entering the PSAs with Taber, the District indicated Taber would be awarded the Lease-Leaseback Contract. [Citation.] Thus, while performing the preconstruction services, Taber was <u>already</u> <u>the</u> <u>intended</u> <u>lease-leaseback</u> <u>contractor</u>. . . . [¶] Taber and the District entered into the PSAs and the Lease-Leaseback Contract as part of one transaction. Thus, Taber had no ability to influence the award of the Lease-Leaseback Contract to itself, as it was already selected." (Fn. omitted.)

Taber explained in a footnote that the School District structured the contracts for the HVAC project in two "phases because the Lease-Leaseback Contract could not be entered into until the plans were approved by the [DSA] . . . . However, the preconstruction services are useful to obtain DSA approval." (See Ed. Code, §§ 17297 ["before letting any contract for any construction or alteration of any school building, the written approval of the plans, as to safety of design and construction, by the Department of General Services, shall be first had and obtained"], 17402 ["Before the governing board of a school district enters into a lease or agreement pursuant to this article, . . . it

---

[3] We describe only the third argument because it is the only argument at issue on appeal.

5

shall have prepared and shall have adopted plans and specifications for the building that have been approved . . . ."].)

Taber submitted evidence that this two-phase arrangement was commonly used for school construction projects.[4]  Taber also noted, "Effective 2017, the statute was amended to avoid the catch-22.  The current operative statute now allows a lease-leaseback contract to specifically include preconstruction services."  (See Ed. Code, § 17406, subd. (b)(1), as amended by Stats. 2106, ch. 521, § 2 ["Notwithstanding Sections 17297 and 17402, for purposes of utilizing preconstruction services, a school district may enter into an instrument created pursuant to paragraph (1) of subdivision (a) [i.e., a lease-leaseback agreement] before written approval by the Department of General Services' Division of the State Architect only if the instrument provides that no work for which a contractor is required to be licensed . . . for which Division of the State Architect approval is required can be performed before receipt of the required Division of the State Architect approval"].)

Plaintiff opposed Taber's "one transaction" argument by pointing out that the RFQ/P's did "not create a binding contract or a duty to contract in the future."  Plaintiff argued the PSA's (entered into in November 2013) and the lease-leaseback agreement (entered into in March 2014) could not be viewed as "one transaction" because the School District was not bound to enter the lease-leaseback agreement until its Board approved it on March 26, 2014.

---

[4] In his declaration in support of the motion for summary judgment, Bret Taber stated he had overseen California school construction projects for over 10 years, and it was "quite common" for the same contractor to perform preconstruction and other preliminary services and then provide the construction services under a lease-leaseback agreement.  He declared, based on his experience in the construction industry, "it is very common in many school districts for a lease-leaseback contractor to perform preconstruction or other preliminary services related to a school that later becomes the subject of a lease-leaseback agreement," and this had occurred in the majority of the lease-leaseback agreements he had been involved with.  Plaintiff did not dispute these statements by Bret Taber.  We also note that plaintiff did not submit any evidence of its own to support its opposition to Taber's motion for summary judgment and instead relied solely on the evidence submitted by Taber.

6

*Trial Court Ruling*

The trial court granted the motion for summary judgment based on Taber's third argument only. (The court found its other arguments lacked merit.) The court agreed with Taber that "there can be no conflict of interest because the intent of the process was 'one fluid transaction' whereby the District would engage preconstruction services with a contractor and then perform lease/leaseback services with *that same* contractor. Thus, Taber's rendering of preconstruction services was not a conflict but the precise intent of the District."

The court reasoned: "[Plaintiff's] theory necessarily rests on the assumption that Taber's consultant role under the PSAs was meaningfully separate from Taber's role as contractor under the lease/leaseback agreements. As Taber argues, if both were really part of what it calls 'one fluid transaction,' then it is no conflict of interest for the contractor—already selected for the whole project—to perform the first phase of the project first. Consider a school district that wants a new computer system. It needs a consultant to design the right system; and then it needs a contractor to build and install the system. If the district first hires the consultant with the intention of hiring the contractor later, then the consultant may well be in violation of [Government Code] § 1090 if it effectively recommends itself as the contractor and obtains the second contract. But if the district signs a single contract under which a single firm is to first design the system, and then build and install it, the contractor is not in violation of § 1090 by carrying out the design phase. By hypothesis, the choice of that contractor for the build phase has already been made (when the contract was entered), before the contractor began serving as a consultant; the consultant cannot be said to have used its consultant 'insider' position to influence the choice of itself as the builder-contractor.

"Taber argues that that is what happened here, in realistic terms. It argues that the District always intended to select a single firm for both the PSAs and the lease/leaseback transaction. . . . The District issued RFQ/Ps to solicit proposals so that it could select a contractor; but once it had selected Taber as the contractor, Taber was selected for the whole project.

7

"Why not just proceed by a single contract, then, if the decision to hire Taber had already been made by November 1, 2013? The answer, as we have seen, is that this project, unlike the computer hypothetical above, was a lease/leaseback. And under state law at the time, it was not lawful to sign a single lease/leaseback contract for design and construction."

The court continued: "The Court views this issue from a viewpoint of common sense and economic reality. It is true that § 1090 is a prophylactic statute, intended to prevent even a temptation of undue influence and self-dealing. Thus, it would not be a defense if Taber could show that while it was wearing its PSA consultant hat, it scrupulously avoided any hint of trying to influence the District to pick Taber for the lease/leaseback agreement. But Taber's argument goes an important level deeper than that: During the time that Taber was allegedly acting as an 'employee' of the District (as a consultant under the PSAs), it categorically *could not have* influenced the District to choose Taber for the lease/leaseback agreement. That's because Taber had already been chosen. The District had decided as of the time of the RFQ/Ps (1) that it was going to do a lease/leaseback deal for its HVAC modernization project; and (2) that it was going to choose a single contractor to do both the preconstruction services part of the project and the actual construction part of the project."

The court addressed plaintiff's argument that the School District was not bound to enter the lease-leaseback agreement before the Board approved it: "It is clearly true that the District still retained an 'out' from entering into a lease/leaseback arrangement with Taber, until it actually signed the lease/leaseback agreements. If Taber had gone bankrupt, or been indicted, or just botched the design work, no doubt the District could have decided not to do a lease/leaseback agreement with Taber. And presumably it could then have proceeded to pick someone else for the lease/leaseback agreement. . . . But that is really no different from a unitary contract containing various 'outs' for the District if the need should arise, or simply making the contract terminatable at the District's convenience. And more germanely to the purpose of § 1090, none of that was an open

8

topic for decision on which Taber could have improperly influenced the District through its PSA consulting work . . . ."

Judgment in favor of Taber and against plaintiff was entered on October 22, 2018.

## DISCUSSION

A.   *Standard of Review*

Summary judgment is proper "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)  The moving party has the burden of persuasion that there is no triable issue of material fact and that the party is entitled to judgment as a matter of law.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  In ruling on the motion, the court must draw all reasonable inferences from the evidence in the light most favorable to the opposing party.  (*Id.* at p. 843.)  We review an order granting summary judgment de novo.  (*Id.* at p. 860.)

B.   *Applicable Law*

Government Code[5] section 1090, subdivision (a), provides in relevant part, "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."  "Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein."  (§ 1092, subd. (a).)

Section 1090 "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072.)  "The common law rule and section 1090 recognize '[t]he truism that a person cannot serve two masters simultaneously . . . .' " (*Id.* at p. 1073.)

"[T]he object of [section 1090] is to remove or limit the possibility of any personal influence, either directly or indirectly which might bear on an official's decision, as well

_____

[5] Further undesignated statutory references are to the Government Code.

9

as to void contracts which are actually obtained through fraud or dishonest conduct." (*Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 (*Stigall*).)  "Officials make contracts in their official capacities within the meaning of section 1090 if their positions afford them 'the opportunity to . . . influence execution [of the contracts] directly or indirectly to promote [their] personal interests' and they exploit those opportunities."  (*People v. Superior Court (Sahlolbei)* (2017) 3 Cal.5th 230, 246 (*Sahlolbei*).)

Although section 1090 refers to "officers or employees" of government entities, in *Sahlolbei*, *supra*, our Supreme Court has recognized "the Legislature did not intend to categorically exclude independent contractors from the scope of section 1090."  (3 Cal.5th at p. 238.)  Not all independent contractors to government entities are covered by section 1090, of course.  Rather, "section 1090 liability extends *only* to independent contractors who can be said to have been entrusted with ' "transact[ing] on behalf of the Government." ' "  (*Id.* at p. 240, italics added, quoting *Stigall*, *supra*, 58 Cal.2d at p. 570.)

The *Sahlolbei* court explained, "So, for example, a stationery supplier that sells paper to a public entity would ordinarily not be liable under section 1090 if it advised the entity to buy pens from its subsidiary because there is no sense in which the supplier, in advising on the purchase of pens, was transacting on behalf of the government."  (*Sahlolbei*, *supra,* 3 Cal.5th at p. 240.)

"In the ordinary case, a contractor who has been retained or appointed by a public entity and whose actual duties include engaging in or advising on public contracting is charged with acting on the government's behalf.  Such a person would therefore be expected to subordinate his or her personal financial interests to those of the public in the same manner as a permanent officer or common law employee tasked with the same duties.  [Citation.]  Thus, for instance, a person who was initially hired as an officer or employee with responsibilities for contracting and then rehired as an independent contractor to perform the same duties and functions would be expected to continue to serve the public faithfully.  Such a contractor would be subject to section 1090."  (*Sahlolbei*, *supra,* 3 Cal.5th at p. 240.)  What matters is whether a person is "in a position

10

to influence how a public entity spends the public's money." (*Id*. at p. 241.) "As an historical matter, it is likely that only 'officers' occupied such a position; today, with the expansion of government and public contracting, regular employees and even consultants can have control over the public purse." (*Ibid*.)

C.    *Analysis*

On appeal, plaintiff contends the trial court misunderstood the basis of its conflict of interest claim. Plaintiff argues Taber's provision of preconstruction services under the PSA's constituted "participating in the making of" the subsequent lease-leaseback agreement, including "the Master Facilities Lease," and therefore "Taber was prohibited from receiving an award of the Master Facilities Lease under Government Code § 1090 and California's common law conflict of interest prohibitions."

Initially, we note that we agree with the trial court's thoughtful and thorough analysis. There was no evidence Taber could have used its preconstruction consulting work to improperly influence the School District to enter into the lease-leaseback agreement with Taber because, as the court described, Taber was "already selected for the whole project" by the time Taber began providing preconstruction consulting services under the PSA's. Indeed, plaintiff implicitly concedes Taber did not improperly influence the School District to select Taber for the HVAC project when it insists the conflict of interest arose "out of [Taber's] participation in the making of the Master Facilities Lease rather than any influence on [the School] District's decision of *who* to award that contract to." (Italics added.)

Instead, plaintiff's position is that once Taber provided preconstruction services on the HVAC project pursuant to the PSA's, Taber was precluded from entering into the lease-leaseback agreement for construction of the same project because to do so would be a conflict of interest. For its position, plaintiff cites *Stigall*, *supra*, 58 Cal.2d 565. Section 1090 prohibits officers and employees from having a financial interest "in any contract *made* by them in their official capacity." (Italics added.) Plaintiff relies on *Stigall*'s holding that the word "made" in section 1090 "encompass[es] the planning, preliminary discussions, compromises, drawing of plans and specifications . . . ."

11

(*Stigall*, *supra*, 58 Cal.2d at p. 571.)  Plaintiff argues Taber's provision of preconstruction services under the PSA's constituted "making" the subsequent lease-leaseback agreement because its services included planning, compromises, and drawing of plans and specifications for the HVAC project.

But section 1090 only prohibits a contract made by a financially-interested party when that party makes the contract in an "official capacity."  Where, as here, the financially-interested party is an independent contractor, section 1090 applies only if the independent contractor "can be said to have been entrusted with ' "transact[ing] *on behalf of the Government.*" ' " (*Sahlolbei*, *supra*, 3 Cal.5th at p. 240, italics added.)  This would be the case if, for example, the independent contractor has been hired to engage in or advise on public contracting.  (*Ibid*.)

In this case, however, it cannot reasonably be said that Taber was hired to engage in or advise on public contracting *on behalf of the School District*.  The School District did not contract with Taber in the PSA's for Taber to select a firm to complete the HVAC project.  Rather, the School District contracted with Taber for Taber to provide preconstruction services in anticipation of Taber itself completing the HVAC project.  Taber provided those services (including planning and setting specifications) in its capacity as the intended provider of construction services *to* the School District, not in a capacity as a de facto official *of* the School District.

An examination of *Stigall* shows plaintiff's reliance on the case is misplaced.  In *Stigall*, the owner of Taft Plumbing Company, Glenn Black, was also a member of the Taft city council and was in charge of the city council's building committee for several years.  (*Stigall*, *supra*, 58 Cal.2d at pp. 566–567.)  The building committee "supervised the drawing of plans and specifications and the call for bids for the construction of a civic center."  (*Id*. at p. 567.)  When the bids came in, Taft Plumbing Company was the low bidder for the plumbing work.  After objections were raised that Black was a council member and building committee member, the council readvertised for bids, and Taft Plumbing Company was again the low bidder for the plumbing work.  Three days after the bids were received, a special meeting of the city council was called for the purpose of

12

awarding the contract for the civic center building. At the meeting, Black resigned as a member of the city council, and then the council voted to award the plumbing work to Taft Plumbing Company. (*Ibid*.)

The plaintiff in *Stigall* sued the City of Taft and the Taft Plumbing Company, seeking a declaration that the contract for the plumbing work was void because Black was an official of the city and "a conflict of interest existed which, under statutory law, prohibited the making of a valid contract as between him or his plumbing company and the city." (*Stigall*, *supra*, 58 Cal.2d at pp. 567–568.) Even though Black was no longer a council member when the city awarded the plumbing work to his company, our high court held the plaintiff stated a claim. (*Id*. at p. 571.)

The issue presented in *Stigall* "relate[d] to the timing of Black's resignation with respect to the 'making' of the contract." (*Stigall*, *supra*, 58 Cal.2d at p. 568.) The defendants argued there could be no conflict of interest because Black resigned from the city council before the contract was "made" under section 1090. The court agreed "that Black was no longer a city official at the time the city accepted the offer of Black's company for the performance of plumbing work." (*Id*. at p. 569.) And, although "neither the city nor the plumbing company was bound to the conditions and covenants of the proposal submitted by the company until after Black's resignation," the court reasoned, "if we were to hold that the purpose sought to be accomplished by the enactment of the statutory provisions could, by such strict construction, be so easily frustrated, we would necessarily close our eyes to the clear legislative intent." (*Ibid*.)

The *Stigall* court explained: "In the first place we are not here concerned with the technical terms and rules applicable to the making of contracts. The Legislature instead seeks to establish rules governing the conduct of governmental officials. In this sense, is an act done or an agreement 'made' only when the final, objective affirmation is communicated? It is true that no rights and duties accrue and no contract is technically made until such time, but the negotiations, discussions, reasoning, planning and give and take which goes beforehand in the making of the decision to commit oneself must all be deemed to be a part of the making of an agreement in the broad sense. The instant

13

statutes are concerned with any interest, other than perhaps a remote or minimal interest, which would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the city. [Citation.] Conceding that no fraud or dishonesty is apparent in the instant case, the object of the enactments is to remove or limit the possibility of any personal influence, either directly or indirectly which might bear on an official's decision, as well as to void contracts which are actually obtained through fraud or dishonest conduct. [Citations.]

" . . .

"The circumstances in the instant case present a most pertinent illustration of what might transpire with impunity at other times and places, should the construction insisted upon by defendants prevail. A council member could participate in all negotiations giving a contract its substance and meaning, be instrumental in establishing specifications and schedules most advantageous to his or his firm's particular mode of operation, participate in the selection of his or his firm's offer, resign just prior to formal acceptance of that offer and execute the contract as the other party thereto. While on the one hand there is no allegation or claim of self-serving conduct in the instant case, on the other hand this is not a situation in which a councilman was only remotely connected with the making of the contract. On the contrary, Councilman Black was first forewarned, by the charges made at the time the original bids were submitted that his continued presence on the council might invalidate a contract with his company. Nevertheless, he thereafter participated as a councilman, and the committee of which he had charge supervised the drawing of plans and specifications and the call for bids for the civic center. Manifestly the situation was one fraught with temptation and . . . the legislation 'is more concerned with what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation.' " (*Stigall*, *supra*, 58 Cal.2d at pp. 569–571.)

The court concluded, "[W]e are persuaded . . . to reject in the case at bar the narrow and technical interpretation of the word 'made' and construe its statutory meaning

14

to encompass the planning, preliminary discussions, compromises, drawing of plans and specifications and solicitation of bids, in all of which Councilman Black participated and which here were, in the broad sense, embodied in the making of the contract." (*Stigall*, *supra*, 58 Cal.2d at p. 571.)

In *Stigall*, it was Black's participation in the planning of the civic center building before any contractors were selected and his participation in the selection of his firm's bid, activities undertaken in his official capacity as a city council member in charge of the building committee, that concerned the court. There is no similar situation here. There is no evidence, for example, that Taber drafted the RFQ/P's to its own advantage or participated in the School District's selection of the construction firm to complete the HVAC project, much less that it did either of these things in an official capacity for the School District.

In short, we reject plaintiff's claim that it was a conflict of interest for Taber to enter into the lease-leaseback agreement for the HVAC project after Taber provided preconstruction services on the same project pursuant to the PSA's. There is no evidence that Taber was transacting on behalf of the School District when it provided those preconstruction services. Instead, the RFQ/P's and PSA's show that Taber was transacting business as a provider of services to the School District.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent Taber.

_____
Miller, J.


We concur:


_____
Kline, P.J.


_____
Richman, J.


A155803, *California Taxpayers Action Network v. Taber Construction, Inc.*

Trial Court:  Superior Court of Contra Costa County


Trial Judge:  Hon. Charles S. Treat


Carlin Law Group, A.P.C., Kevin R. Carlin, for Plaintiff and Appellant


Finch, Thornton & Baird, LLP, Jason R. Thornton, Patrick W. McManus, for Defendant and Respondent


A155803, *California Taxpayers Action Network v. Taber Construction, Inc.*